IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JASON RAMON JORDAN, | ) | |
| Plaintiff, | ) | Civil Action No. 7:16cv00228 |
| | ) | |
| v. | ) | |
| | ) | |
| VIRGINIA DEPARTMENT | ) | |
| CORRECTIONS, *et al.*, | ) | By: Elizabeth K. Dillon |
| Defendants. | ) | United States District Judge |

## MEMORANDUM OPINION

Jason Ramon Jordan, a Virginia inmate proceeding *pro se*, filed a civil rights action

pursuant to 42 U.S.C. § 1983. In his amended complaint, Jordan asserts constitutional

challenges to certain classification procedures and decisions that have resulted in his lengthy

confinement under highly restrictive living conditions at Red Onion State Prison (Red Onion).[1]

After review of the record, I conclude that the defendants' motions for summary judgment must

be granted.

## I. BACKGROUND

### A. Red Onion Classification Policies

Jordan was transferred to Red Onion on December 9, 2012, from another VDOC prison

facility. He is serving a term of life imprisonment.[2]

Red Onion and Wallens Ridge State Prison house all VDOC "Level S" inmates. Level S

is reserved for inmates who must be managed in a segregation setting. When a VDOC inmate is

classified to Level S, officials transfer him to one of these facilities, where he may participate in

---

[1] In response to Jordan's claims, the defendants first filed an answer and a motion to dismiss on behalf of the Virginia Department of Corrections (VDOC) (Dkt. No. 27). Jordan next filed an amended complaint (Dkt. No. 32-1). The defendants have now filed motions for summary judgment on behalf of other defendants (Dkt. Nos. 39 and 48), supported with affidavits by Unit Managers Swiney and Duncan and copies of pertinent VDOC policies. Jordan has responded to the defendants' motions (Dkt. Nos. 42 and 54), making the motions ripe for disposition.

[2] The following summary of facts about Red Onion policies and Jordan's classification proceedings are based on the parties' submissions noted above and are largely undisputed.

the Segregation Reduction Step-Down Program designed to help him progress in stages toward a return to the general prison population. (Operating Procedure ("OP") 830.A, at 12-34, Dkt. No. 40-1.) The step-down program, first implemented in 2012, has the stated purpose to provide "established procedures for incentive based offender management which will create a pathway for offenders to step-down from Security level S to lower security levels in a manner that maintains public, staff and offender safety." (OP 830.A(I).) The program is goal-oriented: when inmates exhibit positive behaviors, such as anger management and respect, and succeed in completing the established goals in each stage of the procedure, they are rewarded by moving to the next step and earning its additional privileges. (Swiney Aff. ¶ 4, Dkt. No. 40-1.)

As described in OP 830.A(III), each newly classified Level S inmate is assessed and assigned to the appropriate privilege level within Level S: intensive management (IM), special management (SM), or the reentry unit (reserved for inmates within two years of release). An inmate is assigned to IM status if evaluators determine that he has "the potential for extreme and/or deadly violence," as indicated by a history of violent disciplinary infractions against staff or other inmates, or an "extensive criminal history and lifestyle that has escalated so that extreme/deadly violence has become a behavior characteristic." (OP 830.A(III).) The policy expressly states that "[t]he potential for extreme or deadly violence is not eliminated despite the offender's daily institutional adjustment even when providing more than a year of compliant, polite, and cooperative behavior and attitude." (*Id.*) Alternatively, an inmate may be placed in IM status because of his "routinely disruptive and threatening pattern of behavior and attitude" or because he is "incarcerated for a notorious crime that puts [him] at risk from other offenders." (*Id*.) On the other hand, an inmate is assigned to SM status if evaluators find that he has a history of "repeated disruptive behavior at lower level facilities, . . . fighting with staff or

offenders, and/or violent resistance" that harmed staff or other inmates, but "without the intent to invoke serious harm, . . . kill, or [cause] serious damage to the facility." (*Id.*)

Inmates in each pathway are further sub-classified under OP 830.A as follows, starting with IM-0 or SM-0, the most restrictive status, and ending with Security Level 6, the least restrictive: Intensive Management (IM): IM-0, IM-1, IM-2, and Security Level 6 (also known as the IM-SL6 Closed Pod); Special Management (SM): SM-0, SM-1, SM-2, SM-SL6 (also known as Structured Living — Phase 1 and Phase 2). (*See* OP 830.A(IV)(D) and (E).) The step-down program in OP 830.A is a so-called cognitive program that requires the inmate to complete a workbook set called the *Challenge Series*, remain infraction free, meet responsible behavior goals, and participate in self-improvement and education programs. When an inmate meets the goals designated for a step, he may be advanced to the next step and receive the additional privileges assigned to it. (*Id.*)

All Level S inmates in the IM and SM categories are housed in single cells and, until they reach the SM-SL6 stage, are restrained in handcuffs and shackles and escorted by two officers whenever they leave their cells. (*See* OP 830.A Attach. 1-3, at 24-34, Dkt. No. 40.1.) These restraint requirements mirror the security measures applicable during temporary terms of segregated confinement at any VDOC facility. (OP 861.3(V)(D), at 46, Dkt. No. 40-1.) Per policy, Level S inmates in the IM and SM pathways, like segregation inmates in other VDOC facilities, receive meals in their cells (the same types of meals that inmates in general population units receive), receive not less than three showers per week, and have out-of-cell recreation for one hour, five days per week. These inmates generally can have limited telephone use, weekly non-contact visitation, limited use of radio and television, and limited commissary purchases. They can possess at least two library books per week, receive and send mail, and possess legal and religious materials. The privileges an IM or SM inmate may earn when advanced a step

include more library books per week, more commissary purchases, more non-contact visits or telephone calls, increased TV time and channels, and even limited job possibilities.

IM or SM inmates who do not meet the standards for discipline, responsible behavior, self-improvement, and programming can be moved back to a lower step. (OP 830.A(IV)(D)(4) and (E)(4).) Some inmates moved back to a lower step must once again meet the pro-social goals of that step to advance. An inmate's refusal to participate in the step-down program may also be grounds for a reduction in his step assignment back to IM-0 or SM-0, where he may remain, stripped of the privileges he had earned in the higher step, until he chooses to participate. (*See gen.* Swiney Aff., Dkt. No. 40-1; Duncan Aff., Dkt. No. 49.1.)

Members of the Unit Management Team, a multi-disciplinary group of staff who work in the housing units, conduct weekly reviews to track and rate each inmate's progress toward the goals of his assigned step. (Duncan Aff. ¶ 11; OP 830.A(IV)(D) and (E).) They rate his behavior as poor, acceptable, or good in each of several categories, such as personal hygiene, standing for count, and respect. Counselors rate the inmate's program participation every week as incomplete, complete, or positive effort. Officers in each of these groups are encouraged to communicate with inmates about these ratings — to acknowledge positive performance and motivate improvement where needed. In addition, a Dual Treatment Team made up of officials from both Red Onion and Wallens Ridge conducts informal monthly reviews of each inmate's progress. (*Id.*)

When an inmate completes the *Challenge Series* curriculum and evaluators deem that he has achieved its behavioral goals in SM-2, he is stepped down in security level from Level S to SM-SL6. (OP 830.A(IV)(F).) At this point, officials assess each inmate and assign him to one of three SL6 program pods geared to safely reintroduce him into a social environment to interact

with other inmates and test his readiness for possible transfer out of Level S to Security Level 5, and then to other non-segregation settings.[3]  (*Id.*)

In the SL6 step-down pod, to which most SM-2 inmates would advance, inmates may progress through two phases.  (*Id.*)  In SL6 Phase 1, they are still in single cells, but they are permitted to leave their cells unrestrained for movement to the shower and recreation and, gradually, to participate in the *Thinking for a Change* curriculum with other inmates in groups of up to fifteen participants.  Inmates in SL6 Phase 2 are double-celled and unrestrained for showers and recreation, have limited outside recreation with other inmates, and can walk to meals with other inmates to eat their meals together in the dining hall.

By contrast, if an IM inmate reaches IM-2 status, he can become eligible for assignment to the lowest security level for an IM status inmate:  the IM-SL6 Closed Pod.  The Closed Pod is expressly designed "to create an opportunity for an increased quality of life for offenders possibly facing a long term in high security."  (OP 830.A(IV)(G)(1).)  Closed Pod inmates continue to have single-celled housing, segregated showers and recreation areas, and out-of-cell restraints, shackles, and dual escorts.  Closed Pod inmates can, however, earn more privileges than any other group of IM inmates, such as more in-pod job assignments, more programming in-cell and in small groups in secure chairs, video visitation, and longer in-person visitation.

Policies provide that in addition to the weekly and monthly informal progress ratings by the Unit Management Team and Dual Treatment Team, all segregation inmates, including those participating in the step-down program, are to receive a formal review by the Institutional Classification Authority ("ICA") every ninety days to determine whether their segregation status remains appropriate.  (Swiney Aff. ¶ 7, Dkt. No. 40-1.)  Among other actions at these reviews, the ICA makes recommendations for step increases or reductions.  (*See*, *e.g.,* ICA Hearing

---

[3]  Two of the SM-SL6 pods are designed for inmates with specialized needs, such as mental health issues or other vulnerabilities.  (*Id.*)

Report, May 8, 2016, at 32, Dkt. No. 40-2.) Furthermore, according to OP 830.A(IV)(K)(1)(a), "[a] team external to [Red Onion and Wallens Ridge] will perform an annual review of each [Level S] offender's case." This review includes a reassessment of whether the inmate continues to meet the criteria for Level S and/or the IM or SM path to which he has been assigned. Per policy, all classification decisions may be appealed through the Offender Grievance Procedure, to which Level S inmates have access. (OP 830.1(IV)(G), at 43, Dkt. No. 40-1.)

**B. Jordan's Classification Proceedings**

Shortly after Jordan's arrival at Red Onion in December 2011, the ICA conducted an intake review of his segregation status. (Swiney Aff. Encl. D-E, Dkt. No. 40-1.) Jordan was present, but did not make a statement. The ICA recommended that Jordan remain assigned to administrative segregation because of recent disciplinary convictions he had incurred that included grabbing a nurse between the legs and threatening to stab an officer who was trying to conduct an interview about an assault. The ICA continued this recommendation at his next review in March 2012 and in May 2012, after he incurred an infraction for stabbing another inmate with a four-inch shank in a gang-related incident. (*Id.* at Encl. F.) Jordan received regular reviews of his segregation status in July and September, and after an ICA review on October 2012, he was assigned to the Special Management pathway, SM-0 status, under a former version of the step-down procedure. (*Id.* at Encl. J, Dkt. No. 40-2.) In December 2012, however, after an ICA review with Jordan present, the ICA recommended that his status should be changed to the Intensive Management pathway, IM-1 status, because he needed "a longer period of stable adjustment" and to complete the *Challenge Series*. (*Id.* at Encl. L.) The ICA reports note that Jordan was present and made statements at most of these reviews.

Jordan received regular reviews of his segregation assignment in March, May, and August 2013, when the ICA recommended advancing him to IM-2 status. (*Id.* at Encl. M-P.)

After reviews in November 2013 and February, May, and August 2014, the ICA recommended continuing Jordan's IM-2 status, despite his refusal to participate in one review and his recent commission of a disciplinary infraction. (*Id.* at Encl. Q-U.) In November 2014, the ICA recommended moving Jordan back to IM-0 status because of poor institutional adjustment and several recent disciplinary charges. (*Id.* at Encl. Y.) After reviews in February and May 2015, the ICA recommended advancing Jordan to IM-1 status; he had completed the *Challenge Series* and avoided disciplinary infractions for nine months. (*Id.* at Encl. AA.) In August 2015, the ICA recommended IM-2 status for Jordan, and that change was approved. (*Id.* at Encl. BB.) After a review in October 2015, the ICA recommended that Jordan be allowed to earn good conduct time. (*Id.* at Encl. DD.) He continued at IM-2, however, after segregation reviews on November 2015 and January 2016. (*Id.* at Encl. EE-FF.)

In March 2016, the Dual Treatment Team and the ICA recommended advancing Jordan from Level S to Security Level 6; the warden approved this change, and Jordan was transferred to the Closed Pod. (*Id.* at Encl. GG.) After status reviews in April, June, July, and August 2016, the ICA recommended that he remain classified to the Closed Pod, despite the fact that he had incurred a disciplinary conviction for threatening bodily harm and had spent some time in pre-hearing detention. (*Id.* at Encl. HH-MM.) In September 2016, however, the ICA recommended changing Jordan from Level 6 to Security Level S again because he had incurred two disciplinary charges while in the Closed Pod. (*Id.* at Encl. OO.)

At Jordan's annual review in October, the ICA recommended that he continue to earn good conduct time while in Level S; the report noted that Jordan had completed the first two *Challenge Series* books, was working as a utensil prep worker, and was enrolled in a Distance Learning Program. (Duncan Aff. Encl. A, Dkt. No. 49-1.) In December 2016 and March 2017, the ICA recommended IM-0 because Jordan had not completed the step-down criteria, but after

his review in May 2017, he was advanced to IM-1. (*Id.* at Encl. B-D.) The ICA report for Jordan's July 2017 review noted that he had stated, "Fuck that review, fuck that program." (*Id.* at Encl. F.) Nevertheless, the ICA recommended allowing him to remain at IM-1 to continue working on the step-down goals. (*Id.*)

## C. Jordan's allegations

Liberally construed, Jordan's verified amended complaint asserts claims that application of OP 830.A on its face and as applied to him prolongs an inmate's confinement under unfair segregation conditions without federally required procedural protections, in violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and that those conditions violate the Eighth Amendment's prohibition against cruel and unusual punishment. (Am. Compl. ¶¶ 97-99, Dkt. No. 32-1.) Jordan sues VDOC administrators for the OP 830.A policy iteself and failing to correct the alleged constitutional violations. He also sues supervisory and treatment officials at Red Onion for the undesirable conditions and for improperly making or failing to correct the allegedly unfair classification decisions imposed on him under OP 830.A without sufficient due process. Jordan seeks monetary damages and injunctive relief to abolish OP 830.A and alleviate harsh conditions at Red Onion. (*Id.* at ¶ 102.)

Jordan alleges that officials arbitrarily assigned him to IM status without allowing him to be present or to offer argument, contradictory testimony, witnesses, or evidence (*id.* at ¶¶ 80-82m 85, 91); that OP 830.A discriminates against IM inmates, who suffer a much more restrictive environment than inmates in other forms of administrative segregation (*id.* at ¶ 69); that IM status permanently prevents an inmate from working his way out of segregated confinement at Red Onion by completing the *Challenge Series*, whereas SM status inmates who complete the same series can work their way to general population (*id.* at ¶ 64); that review between the various IM and SM steps is not meaningful (*id.* at ¶¶ 66, 86); that his progress to the

next step has been denied numerous times without adequate explanation even when he was polite and infraction free (*id.* at ¶¶ 87); that officers can purposefully report his progress inaccurately; and unit managers or others can change his step status without notice or a hearing (*id.* at ¶ 66-67). Jordan also complains that OP 830.A can affect inmates' opportunities for parole and earning good conduct time. (*Id.* at ¶¶ 65, 101.)

Jordan's submissions complain generally about the restrictive conditions IM inmates suffer, compared to SM inmates, when they progress from IM-2 to the Closed Pod. He calls the Closed Pod a "pseudo general population" pod in which inmates have almost no out-of-cell activity without full restraints and are housed in a secure area guarded by officers in gun posts and others with shank proof vests and dogs. (*Id.* at ¶ 70-78.) Jordan complains that Closed Pod inmates have no access to a gym, a normal recreation yard, a law library or dining hall, a job outside the pod, or contact visits or jobs without being shackled to a chair. He alleges that IM inmates' cell assignments are rotated every ninety days to hamper socialization with others, and IM inmates have no contact with inmates in other pods. He contends that these conditions are not compliant with other VDOC policies regarding conditions for special housing units. (*Id.* at ¶ 71.) In his unverified responses to the defendants' motions, Jordan's primary complaint is that unit managers routinely approve their own recommendations for step changes, in violation of VDOC policy. (*See gen.* Pl.'s Resp., Dkt. Nos. 42, 54.)

Jordon alleges that his IM status and living conditions have caused him the following injuries: "mental illness and / or frustration of pre-existing mental illnesses / anguish / deteriorations / night terrors"; "anxiety, headaches, loss of sleep, and (to [his] belief) akathisia"; physical deterioration and weight loss; and deteriorating eyesight "due to constant exposure to extremely bright fluorescent lights in cells." (Am. Compl., at ¶ 101, Dkt. No. 32-1.) In later, unsworn submissions, Jordan also claims that five years of invalid ICA proceedings and

segregation have caused him emotional distress that has been diagnosed as bipolar disorder and treated with medications at Red Onion.  (Pl. Resp. 11, Dkt. No. 42.)  Jordan states that he did not take medication before his transfer to Red Onion.  (*Id.*)

## II. DISCUSSION

**A.  Summary Judgment Standard**

Federal Rule of Civil Procedure 56(a) provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).  In considering a motion for summary judgment under Rule 56, a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 255; *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific, admissible facts that demonstrate the existence of a genuine issue of fact for trial. *Id.* at 322-23.  A party is entitled to summary judgment if the record as a whole could not

lead a rational trier of fact to find in favor of the non-movant. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *see Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) ("Mere unsupported speculation . . . is not enough to defeat a summary judgment motion.").

Summary judgment is not appropriate where the ultimate factual conclusions to be drawn are in dispute. *Overstreet v. Ky. Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). In adjudicating a motion for summary judgment, a court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986). Instead, a court accepts as true the evidence of the non-moving party and resolves all internal conflicts and inferences in the non-moving party's favor. *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

## B. Initial matters

Section 1983 permits an aggrieved party to file a civil action against a person for actions taken under color of state law that violated "a right arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). It is well settled that neither the Commonwealth of Virginia nor any governmental entity acting as an arm of the Commonwealth, such as the VDOC, is a "person" subject to suit under § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989). As such, Jordan cannot prevail on any claim under § 1983 against the VDOC as a defendant. The court will, therefore, grant the VDOC's motion to dismiss.

To the extent that Jordan brings this action against the other defendants in their official capacities for monetary damages for past violations, such relief is not available under § 1983. *Id.*

at 70.  Therefore, the court will grant defendants' motion for summary judgment as to all such claims.

In September 2016, counsel for the defendants filed a suggestion of death (Dkt. No. 26) regarding the death on August 19, 2016, of defendant Elizabeth Thornton, Corrections Operations Administrator for the VDOC.  Jordan has failed to file any motion for substitution of a proper party to any unextinguished claim he had against Thornton.  *See* Fed. R. Civ. P. 25(a) (allowing dismissal of claims against deceased party if no motion for substitution is filed within ninety days from service of notice of death).  Accordingly, the court will dismiss without prejudice all claims alleged against Thornton.

Furthermore, the court will summarily dismiss without prejudice all claims against defendant K. Stewart under 28 U.S.C. § 1915A(b)(1) for failure to state a claim.[4]  Stewart has not waived service or filed a response to Jordan's amended complaint.  As such, she is not a party to the motions for summary judgment.  For the reasons discussed at length below in granting the other defendants' motions for summary judgment, however, Jordan has not alleged facts stating any actionable claim that Stewart's participation in the challenged classification proceedings violated his constitutional rights in any way.

## C.  Due Process

Jordan expressly states that he is challenging his initial classification to IM status instead of SM status under OP 830.A and the subsequent classification adjustment decisions within that pathway.  (Am. Compl. ¶ 46, Dkt. No. 32-1.)  He contends that the manner in which the defendants reached or enforced these decisions violated his substantive and procedural federal due process rights.

---

[4]  Under 28 U.S.C. § 1915A(b)(1), the court is required to dismiss any action or claim filed by a prisoner against a governmental entity or officer if the court determines it is "frivolous, malicious, or fails to state a claim upon which relief may be granted."

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

Jordan's substantive due process claim fails at the outset. It is well established that "the Due Process Clause affords [the inmate] no greater protection than does the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Jordan's contention that living conditions in segregation constitute punishment without a legitimate penological purpose and inflict physical harm on him "fall squarely within the ambit of the Eighth Amendment — not the due process clause." *See Prieto v. Clarke*, 780 F.3d 245, 251 (4th Cir. 2015). Therefore, the court will address Jordan's complaints about the ill effects of living conditions at Red Onion separately, under the applicable legal standard for Eighth Amendment claims.

"To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). As a convicted prisoner, Jordan does not have an inherent, constitutionally protected liberty interest in release from a more restrictive security classification. *Id.* at 221-22. A state-created liberty interest may exist, however, if Jordan (a) points to "a basis for an interest or expectation in state regulations" in avoiding the conditions of his confinement under the segregation classification scheme at Red Onion, *Prieto*, 780 F.3d at 250; *and* (b) shows that those conditions "impose[] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484

(1995).  Only if Jordan makes both showings does the Due Process Clause require a particular measure of procedural protection before he can be deprived of his liberty interest.  *Id.*

The court concludes that Jordan has a state-created liberty interest here.  VDOC procedures require the ICA to conduct a focused review process before a Level S inmate may be assigned to the IM or the SM pathway.  (*See, e.g.,* OP 861.3(IX)(A); OP 830.A(IV(b)).  Policy also provides that at least every ninety days, the ICA will review each Level S inmate — including those participating in the step-down program — to determine whether his current segregation status remains appropriate or should be adjusted.  (*See* OP 861.3(IX)(A); OP 830.A(IV)(K)(5).)  These review policies create a potential liberty interest for Jordan in avoiding and in being released from the restrictive conditions of his current segregation status.  *See Incumaa v. Stirling*, 791 F.3d 517, 527 (4th Cir. 2016) (finding that state prison's policy requiring periodic classification reviews for segregation inmates created a potential liberty interest).

The court must next determine if Jordan's continued confinement in the various segregation classifications within the OP 830.A categories imposes "atypical and significant hardship" compared to the "ordinary incidents of prison life."  *Sandin*, 515 U.S. at 484.  Absent evidence to the contrary here, the "ordinary incidents of prison life" for Jordan are the conditions of general population status.  *Incumaa*, 791 F.3d at 527.

The atypical hardship requirement is a high hurdle to clear.  Mere limitations on privileges, property, and activities for administratively segregated inmates . . . fall within the expected perimeters of the sentence imposed by a court of law."  *Sandin*, 515 U.S. at 485.  Moreover, it is well established that a temporary assignment to segregated confinement — thirty days or even six months, with reduced privileges, few out-of-cell activities or socialization

opportunities, and heightened security measures — is not atypical or significant hardship. *See Sandin*, 515 U.S. at 485-86; *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997).

Moreover, "[t]he State's first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkinson*, 545 U.S. at 227. Because "[t]he difficulties of operating a detention center must not be underestimated," a reviewing court must grant prison officials "substantial discretion to devise reasonable solutions to the problems they face" in maintaining prison security and safety. *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012).

The Supreme Court in *Wilkinson* found that the supermax confinement conditions challenged in that case imposed atypical and significant hardship under *Sandin* based on three distinctive characteristics. These supermax inmates were (a) "deprived of almost any environmental or sensory stimuli and of almost all human contact"; (b) assigned to supermax status for "an indefinite period of time, limited only by [the] inmate's sentence"; and (c) lost their right to parole consideration even if otherwise eligible. *Wilkinson*, 545 U.S. at 214-15. The Court held: "While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context." *Id.* at 224. Similarly, in *Incumaa*, the Fourth Circuit found a protected liberty interest in avoiding assignment to South Carolina's supermax prison based on the isolating and restrictive nature of the living conditions combined with the length and indefiniteness of the plaintiff's twenty-year confinement there. 791 F.3d at 531-32.

The prison policies in these cases provided "no indication how long [an inmate] may be incarcerated [at the supermax] once assigned there," *Wilkinson*, 545 U.S. at 215, because they provided for infrequent review of the continued appropriateness of an inmate's specific segregation status and offered no clear criteria for him to become suitable for release from the

supermax.  *Incumaa*, 791 F.3d at 522-23.  Officials repeatedly recommended the inmates'

retention at the supermax without providing any behavioral basis for doing so.  *See id.* at 521-23.

Undeniably, VDOC inmates classified to Level S, particularly those assigned IM status,

are confined under highly restrictive conditions at Red Onion, including single-cell assignment,

limited out-of-cell activity and face-to-face contact with other inmates, and movement outside

the cell only in full restraints and with dual escorts.  The mere existence of these conditions at

Red Onion, however, does not render confinement there atypical or significantly harsh because,

under OP 861.3(V)(D), general population inmates can expect temporary terms in segregated

confinement under similar restrictions.  *See Sandin*, 515 U.S. at 486 (thirty days); *Beverati*, 120

F.3d at 504 (six months).

And in many other ways, living conditions in IM status approximate conditions for

general population inmates.  As stated, IM status inmates have access to hygiene and legal

materials, telephone usage, legal counsel, medical and mental health care, library books,

commissary items, ingoing and outgoing mail services, and the grievance procedure.  They may

possess property items, including religious materials, in their cells, and they receive regular

meals, laundry services, and visitation opportunities.  The evidence here does not support a

finding that Jordan was subjected to the sort of prolonged, extreme deprivation of sensory stimuli

or social contact that gave rise to the concerns in *Wilkinson*, 545 U.S. at 214 (noting that

supermax inmates were "deprived of almost any environmental or sensory stimuli and of almost

all human contact" . . . "for an indefinite period of time").  Among other things, the record

indicates that Jordan was able to converse with officers and with other inmates, and have phone

privileges and visitation.

Jordan contends that the conditions imposed in IM status are atypical and significant

because this status is allegedly permanent.  However, VDOC policies and Jordan's own

classification history belie this claim and demonstrate that IM status is neither permanent nor indefinite. By participating in the procedures of OP 830.A, Jordan earned advancement from the most restrictive segregation status of IM-0 to IM-1 and IM-2 and then to Level 6 and the Closed Pod, where he stayed for several months. In so doing, he earned additional privileges, including more socialization activities and the opportunity to hold a job. Even after disciplinary infractions resulted in his reduction back to IM-0 in September 2016, within five months, he had earned advancement to IM-1. Furthermore, the ICA records provided reflect that authorities regularly reviewed the appropriateness of Jordan's Level S and IM status for possible adjustment to the SM pathway, SL6, and in time, further reductions to Security Level 5 and transfer out of segregation altogether.

After careful review of OP 830.A, the court concludes that this step-down procedure addresses and alleviates the isolating conditions and indefiniteness identified in *Wilkinson* and *Incumaa* as distinguishing factors of "atypical and significant" hardships presented by a prison's long-term segregation scheme. An IM-0 status inmate like Jordan is subject to long-term, restrictive conditions, but OP 830.A provides behavioral criteria for him to qualify for incremental reductions of restrictions and increases in privileges. With concerted effort to change his thinking and behavior as he works through the *Challenge Series*, he can earn his way to enjoyment of additional social interaction and activity while in segregated confinement. OP 830.A's steps allow him to make measurable progress toward reclassification to lower security statuses and, ultimately, to transfer to general population conditions. As such, under OP 830.A, an inmate's confinement in segregation at Red Onion is, for a likely majority of inmates, only as lengthy and restrictive as dictated by his own effort and behavior.

Jordan complains that officials can purposely use OP 830.A and allegedly fabricated disciplinary charges to prolong an inmate's confinement in IM condition. However, the team

assessment approach and the multi-level review procedures built into VDOC policies protect against such willful, individual actions to deny any one inmate the ability to move through the steps.

Furthermore, the court finds no evidence that Jordan's IM status has inevitably affected the length of his confinement so as to trigger a constitutionally protected liberty interest. *Sandin*, 515 U.S. at 487. Nothing in the administrative segregation policies before the court indicates that assignment to IM status terminates an inmate's parole eligibility. Moreover, Jordan does not state facts indicating that he was ever eligible for parole on the sentence he is serving, and the record indicates that he has been earning good conduct time while in IM status.

For the reasons stated, the court finds no material fact in dispute on which Jordan can establish that his confinement in IM status under OP 830.A is atypical and significantly harsh compared to conditions contemplated by his sentence. As such, Jordan has no constitutionally protected liberty interest in avoiding any particular security classification or reclassification under OP 830.A. Therefore, he also has no actionable claim under § 1983 that any particular procedural protection is constitutionally required during the OP 830.A classification and review proceedings. *Sandin*, 515 U.S. at 486-87.[5]

Jordan also has no viable claim under § 1983 that any of the defendants have misconstrued or misapplied the OP 830.A procedures or other VDOC policies. State officials' failure to abide by state procedural regulations is not a federal due process issue and is, therefore, not actionable under § 1983. *Riccio v. Cty. of Fairfax*, 907 F.2d 1459, 1469 (4th Cir. 1990) ("If

---

[5] The court's conclusions in this case are consistent with past rulings rejecting due process challenges to the VDOC's step-down procedures. *See, e.g., Obataiye-Allah v. Virginia Dep't of Corr.*, No. 7:15CV00230, 2016 WL 5415906 (W.D. Va. Sept. 28, 2016) (Jones, J.), *aff'd sub nom. Obataiye-Allah v. Clarke*, No. 16-7413, 2017 WL 1828018 (4th Cir. May 4, 2017) (finding no constitutionally protected liberty interest in avoiding IM status under Red Onion's step-down procedures); *Muhammad v. Mathena*, No. 7:14cv00529, 2017 WL 395225 (W.D. Va. Jan. 27, 2017) (same) (Conrad, J.).

state law grants more procedural rights than the Constitution would otherwise require, a state's failure to abide by that law is not a federal due process issue.").

For the stated reasons, the defendants are entitled to judgment as a matter of law as to Jordan's claims that one or more of them violated due process by enacting OP 830.A or by using these procedures to make particular classification decisions about Jordan's segregated confinement status. The court will grant the motions for summary judgment on Jordan's due process claims accordingly.

**D. Equal Protection**

The Equal Protection Clause generally requires the government to treat similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). It "does not take from the States all power of classification, but keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). Thus, to prove an equal protection claim, an inmate "must first demonstrate 'that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Id.* (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). He must next show that the policy is not "reasonably related to [any] legitimate penological interests." *Id.* (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)). This element requires the inmate to "allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." *Id.* Jordan does not state facts supporting these necessary elements of his equal protection claim.

First, Jordan has not demonstrated that he was similarly situated to inmates in SM status when officials classified him to IM-0 status. Jordan is serving a life sentence and had recently committed serious disciplinary infractions. After these incidents, officials could lawfully treat

him differently from other segregation inmates with histories of less serious or less recent disciplinary convictions or sentences.

Second, Jordan does not show that he has been treated differently than any other inmate during periodic reviews for step changes. Neither Jordan nor any other Level S inmate can change his step status under OP 830.A merely by avoiding disciplinary convictions and being polite. A step change requires his progress on the *Challenge Series* curriculum and earning the classification officers' recognition that he is working to make positive changes in his thinking and behavior.

Third, while the OP 830.A step-down procedure purposefully treats SM and IM status inmates differently, these differences are rationally related to legitimate governmental purposes. The procedure reasonably uses the incentive of earning increased privileges and lower restrictions to encourage improved offender behavior and self-development "in a manner that maintains public, staff and offender safety." OP 830.A(I). The logical connections between the policy's provisions and the furtherance of its legitimate penological goals are self-evident. *See Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security [is] perhaps the most legitimate of penological goals.").

For the stated reasons, the court finds no material dispute of fact on which Jordan could prove an equal protection violation here. Therefore, the court concludes that the defendants are entitled to summary judgment as a matter of law and will grant their motion on this claim.

**E. Eighth Amendment**

Jordan contends that living conditions imposed because of his status under OP 830.A violate the Eighth Amendment, which "protects inmates from inhumane treatment and conditions while imprisoned." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "[T]he Constitution does not mandate comfortable prisons," however, and conditions that are "restrictive and even

harsh . . . are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981).  It is well established that only the "unnecessary and wanton infliction of pain" implicates the Eighth Amendment.  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

To sustain an unconstitutional conditions claim, a prisoner must show that: (1) objectively, the deprivation was sufficiently serious, in that the challenged official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions.  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

Jordan's allegations do not make these showings.  He does not allege that he has been deprived of any necessity for life, such as food or shelter, while in IM status.  Instead, Jordan conclusorily asserts that restrictive conditions and limited privileges and socialization opportunities, along with his IM status itself, have caused him various mental and physical discomforts, such as loss of sleep and weight, vision issues, headaches, and anxiety.  He fails to present facts, however, showing that any of these health concerns qualified as a serious or significant harm or that he needed medical care for them.  Jordan's diagnosed bipolar disorder is a serious mental health condition, but he offers no evidence that could persuade a reasonable fact finder that his detention under IM status living conditions *caused* this disorder or aggravated it in any way.[6]  Thus, the court finds that the defendants are entitled to summary judgment as a matter

---

[6] In any event, Jordan mentions his bipolar disorder only in a response to the defendants' motions.  A plaintiff cannot use a response to a motion for summary judgment to amend or correct deficiencies in the complaint challenged by that summary judgment motion. *See Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009).  Therefore, a claim concerning this condition is not properly before the court in this action.

of law on Jordon's claim that IM status has subjected him to living conditions that violated the Eighth Amendment, and it will grant their motions as to this claim.

## III.  CONCLUSION

For the reasons stated, the court concludes that the defendants' dispositive motions must be granted.  Jordan's claims against defendant Thornton must be dismissed without prejudice under Rule 25(a) of the Federal Rules of Civil Procedure, and his claims against defendant Stewart must be dismissed without prejudice under 28 U.S.C. § 1915A(b)(1).

An appropriate order will be entered.

Entered: September 18, 2017.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge